Oral argument not to exceed 15 minutes per side. Mr. Rees for the appellant you may proceed. Thank you. Good morning. I'm not sure I look better in three dimension but we'll see. May it please the court. My name is John Christopher Rees. I'm the Deputy Director of Law for the City of Akron OH and I represent the appellant in this case, Officer John Turnure. I have reserved three minutes for rebuttal. I can see that from the clock. In my limited time here today, 12 minutes, I'd like to try to address three things. There's a lot of things in the briefs obviously but I'd like to focus on three things unless of course we go off the rails and that's fine. I can answer any questions that the court may have. Those three things are this. Let me start with the off the rails point because I hope it's not off the rails. You know, the thing that seems clearly established and this for me is the hardest part of the case when it comes to Redrick is that officers should, you know, before you use any force, forget how lethal it is although a gun obviously makes a difference in the equation but even if you're going to use a taser, even if you're going to, you know, grab somebody, particularly when you're coming from behind, shouldn't you announce your presence? And are we stuck in a world in which the officers say one thing but all these other people pretty close proximity saying they didn't hear this warning? Aren't we stuck with the assumption they didn't warn and isn't it clearly established before using force and particularly lethal force that you've got to announce your presence? I think my answer to that is this. The officer Turner testified that he shouted drop the gun, screamed is the word he used, drop the gun, drop the gun, drop the gun. Let's try this a different way. This is a hypothetical so it's not this case but I just want to hear your answer to it. You get a case where the officers admit we didn't say anything, didn't say a word, we were coming from behind, there was no way Redrick could have seen us because we were coming from behind and we thought he might hurt somebody in front of him and we shot him. Don't you have to, in that hypothetical, it's not this case, that hypothetical, wouldn't we say, it's got to be pretty extraordinary circumstances before you don't have to say you're there because the typical person when they hear police will not shoot somebody. That's not what happens. So in that hypothetical, wouldn't you say the officer would have a little trouble? I think that would pose a problem with the gram factor of whether the suspect is actively resisting arrest. Because in our case, the gram factor of whether or not a reasonable officer could have perceived that Mr. Redrick was resisting arrest, that gram factor, was the fact that the officer Turner screamed drop the gun three times and he did not drop the gun. Therefore, you're not answering the question, right? The hypothetical is there is no drop the gun, there's no officer saying a word. It's just the officer coming from behind and I'm going to grant you for the sake of argument that the officer perceives a dangerous situation, perceives the person in Redrick's circumstances as potentially about to hurt somebody, but before you shoot him, aren't you supposed to say drop the gun or stop police? I think you would have a problem with the gram factor that he was not actively, the suspect in that scenario, that hypothetical, was not actively resisting arrest because no command was given. That's clearly established and that's why qualified immunity would be denied in that hypothetical. Well, one gram factor doesn't necessarily defeat qualified immunity. You know, the most important gram factor is whether the suspect posed an immediate threat of serious physical harm. Whether he was actively resisting arrest is one of the other. So let's take it, the hypothetical, no words are uttered by the officer, obviously Redrick doesn't hear anything, but everything is the same as this case. So what the officers see is that he has a gun, the officers see just what you see in the film. Hand there, gun, people moving away, this individual going towards them. Doesn't Garner say use lesser force if, quote, feasible? And here wouldn't it have been feasible to say drop the gun, officers, stop what you're doing? I think, Judge, if you took the no warning out of this equation, I think you still, under the Thornton case, have about the other six or seven Thornton factors. You don't have the fact that he ignored a command, which is a significant factor in our case, but you still have the other ones of prior threat, witnessed firsthand by Officer Turner, you still have Mr. Redrick advancing on the third parties, you still have a gun at the ready. What's the prior threat? The prior threat was that... Hand there? No, no, the prior threat was when Officer Turner exited his cruiser and came across the street, he saw Mr. Redrick pull and show the gun at the group of people, which pull and show is not Officer Turner's words, those are Mr. Redrick's words. Why didn't he say something then? Pardon me? Why didn't he say something then? Well, he was advancing... If you thought it was a threat, you would think the officer would say, stop, what the heck are you doing? Correct, and I think once he got across the street from his cruiser and got behind him on the sidewalk, that's when he started yelling, drop the gun, drop the gun, when he positioned himself behind Mr. Redrick. I don't think when he jumped out of the cruiser with Officer Oco running across the street, I don't think he's saying drop the gun, drop the gun at that point. His testimony is, I wanted to position myself behind Mr. Redrick and when I did that on the sidewalk, I screamed, drop the gun, drop the gun, drop the gun three times, and he did not seek compliance. Officer Turner testified that he did not seek compliance. Officer Oco, there are some witnesses who said they didn't hear that, but Officer Oco testified, and it's in the record, that he did hear him scream, he did hear Officer Turner scream three times, drop the gun, drop the gun, drop the gun. And you think we have to assume that he said that for purposes of this case? I think the question is not, here's where the district court, and this was my first point, it's not whether that Graham factor actually existed. It's whether a reasonable officer could have perceived that after screaming, gun, gun, drop the gun, drop the gun, drop the gun three times, and the suspect did not drop the gun, is it reasonable for an officer to perceive that the suspect is actively resisting arrest? You're assuming that he said it, and there's evidence in the record from which one could conclude that he didn't say it. No, I, Judge, I go back to, we cited the Chappelle case. The fact that other witnesses said they didn't hear it simply stands for the point that other witnesses didn't hear it in the commotion that was going on. That doesn't establish the fact that Officer Turner didn't scream, drop the gun, three times. You know, in the Chappelle case, they went into the house and they screamed, police, police, police, and they're wondering, did Mr. Chappelle even know that they were screaming police? Everybody outside said, we didn't hear it, and the Chappelle court, this court said, that only stands for the proposition that some people didn't hear it. Was the Chappelle the case where the individual they were coming after died? Pardon me? Chappelle the case where the individual they were coming after died? Correct. That was not a case where the person that was ultimately shot actually testified, I didn't hear a thing. That seems a little different. If you said you said something and everybody in this room said you didn't say it, one might wonder, did he really say it? Maybe he's not telling the truth when he says he said it. You seem to be equating people saying, I didn't hear it, with something different than he didn't say it. So that's, I think, where our problem is here. One side says they didn't hear it, which is the equivalent of he didn't say it, I would say, and the other side says I said it. Isn't that just a factual dispute here? And I think that falls into the trap that the district court did, which is sending an issue to the jury of whether or not a gram factor actually existed. That's not the issue. It's whether or not, given officer's turn in his testimony that he shouted three times, drop the gun, drop the gun, drop the gun, was it reasonable, would it be reasonable for, is it reasonable for an officer to perceive that when Mr. Redrick did not react to that command, that he was resisting arrest? If that's an issue for the jury, then that's the issue for the jury. But the issue for the jury is not going to be, did he say it or didn't he say it? That's the improper analysis that we argue in our brief, that the district court. Well, that's a subsidiary question. In deciding whether his actions were reasonable or whether he reasonably could have believed certain things, the jury will make intermediate factual determinations, one of which is whether he actually said it. But, I mean, I hear you saying that whenever an officer says, well, I said this, then the court is obliged to accept that as a fact. Well, the court is free to set aside that Graham factor. And if the court has an issue with the active resistance prong of the Graham analysis, I still think qualified immunity applies simply on the most important element, the most important prong of the Graham analysis was, at the moment, officer, turn your fire, would a reasonable officer have perceived an immediate threat of serious physical harm? Set aside the active resistance prong for a moment, because the case law says, you know, most of these cases aren't, we don't focus on the severity of the crime. We don't necessarily focus on active resistance. We really focus when someone shoots somebody, did they truly pose an immediate threat of serious physical harm? Garner says, I don't think you know that case, but Garner says, don't use lethal force if there's something else feasible. And that's what I don't understand about this case. It's not so much about resisting arrest in terms of saying drop the gun. It's try to stop this bad event from happening short of shooting him. And that's what yelling would do. And that's a feasibility point. And that's clearly established. And that's the thing I'm having trouble with. But, Judge Shultz, I think the case law also is that an officer doesn't have to resort to the least restrictive means. You know, Officer Turnure didn't have to, in that split-second decision, think to himself, did he hear me, did he not hear me? You know, should I taser him, should I not taser him? Should I let him continue to advance on the suspect? There's a fact dispute of whether he said a word. You're having a hard time getting out from under the idea that a jury might think he didn't say a word. But you still think, even if a jury could find that, qualified immunity is appropriate, and I'm struggling with that. The evidence is that Mr. Redrick apparently didn't hear drop the gun, drop the gun, drop the gun. Maybe that's because he was focused on, you know, little Nick and the other person. That only stands for the fact that he didn't hear it. The true issue is, would a reasonable officer placed in Officer Turnure's shoes, after screaming drop the gun three times, and he did not see compliance, would a reasonable officer perceive that was actively resisting arrest? I would say, and you can think about this for a rebuttal, that that is one fact pattern, and I would say that gives you a pretty good chance at qualified immunity. And then there's another fact pattern. What would a reasonable officer do when they see someone about to threaten somebody, potentially shoot them, would they first yell drop the gun? That's the fact pattern you are not, seem to be interested in engaging with. And I'm just telling you, that seems to be a fact pattern we have to contemplate. And I just don't know the answer to that one. But you'll get a full rebuttal. Thank you. All right. We'll hear from the other side. Good morning. May it please the Court. My name is Sarah Gelsinian. I'm here on behalf of the plaintiffs this morning, LaTrent Redrick and Jamon Pruitt. Both LaTrent Redrick and Jamon Pruitt, as you know, were each shot approximately six times by the defendant appellant, in this case, John Turnure, on LaTrent's 21st birthday in Akron, Ohio. So his main point is we have to assume, you know, the officer said what he said. Another officer did hear it. And so from his perspective, he's thinking he's tried to get them verbally to behave. They're not behaving. And, you know, one could argue that maybe it was negligent to shoot as he was doing something with the gun. But negligence, you know, that doesn't suffice for liability. Why don't we just have to say, of course he said what he said. Someone else heard it. And they may not have heard it. That's fine. But at that point, it just looks like negligence and shooting maybe too quickly. The heart of this case is the factual disputes that you have already begun to identify this morning. Whether or not John Turnure said anything to identify himself or to even establish his presence. So one of your theories, if you get to a jury, will be to say to the jury, these two officers are lying. Yes. They never said anything. I mean, isn't that you kind of have to say that, right? You have to say they're lying because they say they said it. You're going to say how could no one else hear this in the proximity, so they're lying. Right. There are multiple people in the proximity, four who have testified thus far in the criminal trial that there were no warnings. Including a fellow officer, a 27-year veteran, Detective Al Jones, who was standing right there in between, in fact, Juman and Latrant and the shooter, Turnure. Al Jones is right in the middle. He doesn't hear anything either. So there are three witnesses, civilian witnesses and Al Jones, who will all testify to the jury. There were no warnings. We didn't hear anything. Couple that with the fact that on the video, there's no, no one is seen on the video acknowledging some kind of a warning behind them. There's no audio on the video, so I don't know why that helps. No, you are correct, Judge. There's no audio on the video, but if you watch the reactions to the people who are on the street there, no one looks up or looks behind to, you know, as Defendant Turnure claims he was screaming, and there's no visual acknowledgement of that anywhere on the video. What was the officer doing, who apparently is not Turnure, but you see in the film to the right? Was he saying anything? No, that is Detective Al Jones, who testified that he did not hear Turnure testify. I understand that. Did he say anything? No. So what Al Jones was... Did he say, stop? What are you guys doing? Knock it off? No, you are correct, actually. He was there in the middle, and he was actually engaging with the groups of guys, saying, knock it off. That's exactly what he was saying, get out of here. One of the people who was in that group, DeMarcus Minter, knew him, and he was saying, get out of here, go. He was trying to diffuse it verbally, and in fact, he had his pepper spray out in case he needed to do something more than that. He never thought to draw his gun, and he never did draw his gun, because it wasn't necessary up until after the point that Defendant Turnure started shooting. So that's exactly what we would present to the jury, and ask that they determine whether or not they believe that Turnure ever gave those warnings, because that is such an essential dispute in this case, because it's not reasonable for an officer in Turnure's position to believe that anyone knew that he was a police officer, unless he identifies himself as one. How far away were they? Were the LeTrent, and Retz, and Jaman from Turnure? Yeah, I mean, I understand he says that he said two things, right? One was telling Jones, he's got a gun, he's got a gun, but Jones never heard that. Correct. And he describes this surreal situation where you're screaming, but nothing comes out, or the person just can't hear you, like in a dream, but how far apart were they when he supposedly said that? Al Jones testified that he was standing about five to ten feet away from Turnure at the time that Turnure began shooting, and that he never heard Turnure yell anything. I don't believe there's any testimony regarding how far away Turnure was from the boys, but I believe it was about ten feet or so, and it's about the same amount of distance as you can then see when they eventually do move on to video, and you can see the guys kind of moving, shot, and then Turnure entering the frame. It wasn't very far. They were certainly within screaming distance, and probably talking distance. One thing that I think is interesting is that the argument to this point is almost entirely focused on whether he did tell him to drop the gun or he didn't. We haven't really talked about what your client's hand was doing at the time the police officer shot. Yes. It seems to me that's got to be at least equally, if not a more important factor here, and the reason that I want to check with you is that would you concede that if, in fact, the video had shown that he was raising his hand and it had a gun in it and he was pointing it at somebody, that's a whole different case? I do believe that that would require a deeper analysis about what was happening there. I mean, we certainly know that holding a gun is not alone enough to justify deadly force, right? You don't think that if he raised his hand up and he pointed the gun at these guys that are hassling him, that that would have justified the officer to shoot? I believe that that probably would have justified the shoot, which is why the dispute regarding what happened and whether or not LeTrent ever did actually do that is so significant. Okay, but where I'm going on this is that at one point your client says the gun was in his pocket. Then at another point he says, well, I showed the butt of the gun, but it was still in the pocket. Then at another point he seems to say, well, the gun was outside my pocket. It was next to my leg. Do you agree so far? He says it was in his pocket and he was showing his pocket at the side.  So if I'm right, if I'm wrong, then I'll go back and look at that. But assuming it was out of his pocket, I think the other interesting question is, what do we do then when the police officer says the gun was separating from his body, whatever the heck that means, versus the kid who says that no, it wasn't. So what do we do with that dispute on an interlocutory appeal? We send it to the jury. And that's why this is such a significant dispute, because either one of those interpretations of what a jury could look at on the video, they could determine it either way, that it corresponds with what LaTrent is saying happened or it corresponds with what Turner is saying happened. And remember, in fact, one jury has already looked at this video and acquitted Jamon of felonious assault. The video does not blatantly contradict the testimony of LaTrent regarding what was happening in the moment that the shooting started, which is that the gun was in his pocket, he had the butt of the gun in his hand, and his arm did not raise up until the time that he was shot in the back by defendant Turner out of the blue. And that's when his arm went up and he went going down to the ground. So that's exactly the kind of question that a jury has to determine. What if I think it's implausible his testimony that he showed the gun because he was trying to diffuse the situation? What if I look at that video and I say, you've got to be kidding me. That is not what his actions suggest and it is not what the people he's encountering suggest. Well, he testified that he was doing that in correspondence with his CCW training, that he showed it and that he was... I'm telling you, it seems really, really implausible to me when I look at that and I see the fear in everyone's eyes. They're running. This does not look like someone who's trying to help the police out as the bars close in Akron. That's not what that looks like. Right. There's no one actually... I don't believe that the video shows that anyone is running when he does that. There is running at other points, but when he has the butt of the gun in his hand, that's when the two groups are still engaging, as I recall what I saw in the video. But that's his testimony regarding what's happening and that's why a jury should decide. I'm assuming, just to tell you what I'm assuming, I'm assuming the part where he tried to diffuse the situation is not captured at all by the video. I'm telling you that after he tried to diffuse the situation, I'm looking at what happened next and I'm like, wow, you need better training on how to diffuse the situation or you're not telling the truth. Right, and that's where he testifies. All hell is breaking loose as the video goes and people look very afraid. And they look afraid of him or the three of them. Well, there's a moment where there is a pointing and in fact the defense pointed that out, has a still frame where there's pointing, right? Yeah. And that, remember, is the moment. It's instantaneous, that moment and then the shooting starts. So to say that those people who have not testified in this case are pointing at LeTrent's gun is not the only way that that can be seen. It could also be understood by the jury that that person was pointing at that mentor and the group in front of LeTrent and Jamon and Joe was pointing behind them at a police officer who was coming up at them and pointing a gun. There's a gun pointing behind them on the sidewalk that none of these guys know about and then there's a gun, a legal authorized gun in Jamon, in LeTrent's pocket with a butt in his hand. So that again is a pivotal moment in the video that a jury should be able to look at and determine whether they really think those people were afraid of. How about Pruitt? How about, so that, I mean, that one seems a little harder, right? He, I mean, from an officer's perspective at that point, at that point he's going after the gun and then looks like he's getting, well, he does fire the gun. So that would not have been unreasonable. Right, so and this is where again it's important to look at, one, that dispute over whether or not Officer Turnure announced himself because it's not, a reasonable officer who does not announce himself and who begins shooting unlawfully into a crowd would know that an individual in that crowd had the right to self-defense and to defense of others. So that's the situation that Turnure is in and has to be considered. Add one other thing. The officer sees someone go get a gun as opposed to let it sit there. Yes, so when Le Trent, Le Trent is shot to the ground and is being shot unarmed continuously on the ground by Turnure when Germain reaches for the gun and holds it into his body and this is where it's really important to look very closely at that video and why again a jury should interpret what's happening because the law is that, again, possession of a gun is not enough. There has to be some addition that he's going to use it, right? So what does Germain do when he picks up the gun off the ground? He kind of holds it to his body like this and then he's shot and it is not until after he is shot multiple times by defendant Turnure that he then shoots one shot in the direction of Turnure and he testified that he did not know it was a police officer. He thought someone from the ground or from the area was shooting at him and it's unreasonable for Turnure to have thought that he would know he was a police officer when he never announced himself and this is again where a jury could certainly look at this information and this testimonial record and find that Germain was in fact defending himself or defending his brother because they already have. You said something that makes me think I had the facts wrong. I thought Redrick was shot multiple times but I thought Pruitt was shot once. Have I got that? I'm misremembering that once. They were both shot multiple times. How many times was Pruitt shot? Five or six. It's a little unclear but it's five or six times. So it's multiple gunshots. So let me see if I get this right. As to the second shooting, so you're saying that the police still should not have done anything when your client reaches out or jumps for the gun, whatever he did, and pulls the gun into his body, right? Yes. So what are you saying the police should, what would a reasonable person have, police officer, have thought was the purpose of the brother grabbing the gun in his hand  Well, it could have been a number of things. One, he could have just been picking it up because he didn't want someone else on the street to pick it up. And he could have been doing it for the purpose of defending himself. In the middle of a gunfight? Well, he thought that the guys on the street were the ones shooting at him. You have to remember what's happening here. This is an unjustified shoot from the start and it continues to be unjustified throughout. So even, defendant Turner continues to shoot at LaTrent long after any alleged threat, any perceivable threat is gone because the second he's shot one time in his back and falls to the ground, that gun is gone. No one is maintaining it. It's just sitting in the sidewalk. And then he shot five, at least five times more. You can actually see his body convulsing on the video. And it's only, I mean, this is what Jamon is sitting next to, believing that a person is just shooting at him on the street, shooting at his brother on the street, and that he has the right to self-defense. And that was also what a reasonable officer in that situation would believe, given the fact that he initiated this use of force in an unlawful manner. So here, as we clearly established, it is our position that the factual disputes are, the record is riddled with factual disputes. The jury must be permitted to review these and determine them as they in fact have one, have once before. There is, was no indicia that LaTrent or Jamon was going to use, were planning to use the guns in a way that would cause a threat to anyone and certainly not to Turner when he shot at them. All of these questions are well within the province of the jury. They're not meant to be decided by the court. And in fact, the district court did the right thing in this case in acknowledging that. And we ask you to affirm that decision and send this back to the court for trial. All right. Thank you. Thank you. We'll hear your rebuttal. Thank you. Thank you. Looking backwards to Judge McKeague's comment about the imminent threat of serious physical harm, I don't even think the court needs to decide whether or not a Fourth Amendment violation here occurred because I read that Supreme Court case Monday, Bond, City of Toleco v. Bond, and that court said we're not even going to touch whether there's a Fourth Amendment violation because the district court, well, the panel, the Court of Appeals, and the appellees in that case failed to point to one single controlling precedent that said under those circumstances what happened here was unlawful. I kept saying Garner. Garner, U.S. Supreme Court decision, don't use lethal force if it's feasible to use less. And wouldn't less be yelling, police, stop, put your gun down. So again, I know what you're going to do. You're going to now repeat what the officer said, and you can do that if you want, but I'm just telling you as I see the case, we have to assume the jury gets to decide whether your client and the other officer were lying or not about saying what they said they said. And I'm going to invite the court or urge the court to even set aside the act of resistance, the shouting of gun, drop the gun, drop the gun. I'm going to focus on what Judge McKeague said, which probably the most important factor is whether or not Mr. Redrick posed an imminent threat of serious physical harm. And the imminency of that threat has nothing to do with whether he said gun, drop the gun, drop the gun, drop the gun, or whether he heard drop the gun. It has to do with... I totally think you're focusing on the right thing, and the difference is somebody who's got the gun up is about to shoot, and I quite agree with you, probably not going to do much to say stop. But that's different from the situation here where it's quite possible saying stop, people would stop, or at least turn around and say, who's that? But taking that out of the equation, we have a prior threat where he's pulled it and showed it. We have it out now by his waist, still advancing on the people that he showed it to earlier. We have him closing the gap of proximity. We have it, as the Thornton and the Tucker case this summer said, we have a deadly threat that could easily turn into deadly action. He had the gun in his hand next to him. Whether you say drop the gun, drop the gun, drop the gun, all the other Thornton and Tucker factors are present here. So essentially what you're saying, as I understand it, is somebody is either in an open carry state or they're in a CCW state, and they've got a permit, and they've got a gun, and they feel threatened, so they take the gun out of their pocket, out of their holster. At that point, without more, you're saying the police can shoot somebody in the back? No. Absolutely not, Jay. So how does that hypothetical differ from the facts of this case? Number one, the whole concealed carry thing doesn't even factor in. A concealed carry permit is not a stand-your-ground permit. One of the facts that a reasonable officer would know in this case is this was before Ohio's stand-your-ground law. Mr. Redrick had a duty to retreat, if feasible, before using deadly force. The Ohio stand-your-ground law was not in effect. Oh, fine, but what has it got to do with what the officer does if there's a gun in your hand by your side? With a prior threat. If you took the prior threat out of this case, that would be an unlawful shoot. The prior threat is allegedly having raised his arm and pointing it at these guys that were hassling him. No. I have to concede at this point. I have to concede what Mr. Redrick testified to, which was he pulled it and showed it to them. But didn't raise it. Mr. Redrick denies he raised it. What is the prior threat, then? And that's just engaging in some kind of semantics. Is pulling and showing a gun? Why is it a prior threat, given that he said he was trying to defuse the situation? Well, I go back to what you said, Judge Sutton. In a crowded downtown bar district, you pull and show a gun. If you're saying that's not tantamount to a threat, that's just engaging in semantics. Pulling and showing a gun in a crowd at bar closing time is a threat. It doesn't have to be pointed. So then back to my hypothetical, you can't shoot somebody if they just have the gun at their side, unless previously they've pulled the gun out and shown it. In Thornton, it was third party told him there was a prior threat. In our case, Turnure saw the prior threat. You also have to have him still advancing on the third parties. If those third parties are running away, no, you can't shoot him. But as you see in the video, they weren't running away. And Mr. Redrick was still advancing toward them with the gun at the ready at his side. I mean, it's all the circumstances. Yes, if it was one circumstance where Turnure jumps out of his cruiser and Mr. Redrick's walking and these guys are running down the street, no, you can't shoot him. Absolutely not. But all the other circumstances that were present in the Thornton case and in the Tucker v. Marquette County case from this past summer, they're all here. And that's the controlling case is what we submit. All right. Thank you very much. No, thank you for your time. Yeah, we appreciate both of your written submissions and your arguments. Thanks for answering our questions, which we always appreciate. Thank you. Thank you very much. The case will be submitted and the clerk.